NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Manufacturing Corporation and NTN Corporation, Plaintiffs,

v.

UNITED STATES, U.S. Department of Commerce and Ronald H. Brown, Secretary, U.S. Department of Commerce, Defendant,

The Torrington Company; Federal–Mogul Corporation, Defendant–Intervenors.

Slip Op. No. 95–165.
Court No. 93–08–00501.

United States Court of International Trade.

Oct. 2, 1995.

Barnes, Richardson & Colburn (Robert E. Burke, Donald J. Unger, Kazumune V. Kano, Lawrence M. Friedman and Diane A. MacDonald), Chicago, IL, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeffrey M. Telep); of counsel: Stacy J. Ettinger, Thomas Fine, Michelle Behaylo, David Ross and Alexandra Levinson, Attorney–Advisors, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC, for defendants.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., John M. Breen, Geert

De Prest and Myron A. Brilliant), Washington, DC, for defendant-intervenor The Torrington Company.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V), Washington, DC, for defendant-intervenor Federal–Mogul.

## *OPINION*

TSOUCALAS, Judge:

Plaintiffs in this action, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN"), are manufacturers, importers and/or exporters of ball, cylindrical roller and spherical plain bearings ("antifriction bearings" or "AFBs") from Japan subject to the proceeding below. NTN contests certain aspects of the final results of administrative review of the United States Department of Commerce, International Trade Administration ("Commerce"), entitled *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order ("Final Results ")*, 58 Fed.Reg. 39,729 (1993), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 42,288 (1993), *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 51,055 (1993), and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 59 Fed.Reg. 9,469 (1994).

This action is before the Court on NTN's motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of the Court.

## *BACKGROUND*

On April 27, 1993, Commerce published the preliminary results of its administrative review of antidumping duty orders on antifriction bearings (other than tapered roller bearings) and parts thereof from Japan, France, Germany, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 58 Fed.Reg. 25,616 (1993).[1]

On July 26, 1993, Commerce published the Final Results at issue. *See Final Results*, 58 Fed.Reg. at 39,729. NTN alleges that the Final Results are flawed because Commerce improperly: (1) deducted direct selling expenses from exporter's sales price ("ESP") rather than adding such expenses to foreign market value ("FMV"); (2) refused to instruct the United States Customs Service ("Customs") to refund antidumping duties deposited on imported merchandise which was re-exported instead of being sold to an unrelated party in the United States; (3) included NTN's sample and other sales made outside the ordinary course of trade from the calculation of FMV; (4) compared U.S. sales to home market sales made at different trade levels; (5) failed to make a level-of-trade adjustment for product price differences due to differences in level-of-trade or other factors; (6) denied NTN a level-of-trade adjustment for indirect selling expenses; (7) included a theoretical amount for idled equipment in calculating cost of production ("COP") and constructed value ("CV"); (8)

---

1. *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 58 Fed.Reg. 25,606 (1993); *Germany*, 58 Fed.Reg. 25,610 (1993); *Italy*, 58 Fed.Reg. 25,613 (1993); *Singapore*, 58 Fed.Reg. 25,620 (1993); *Sweden*, 58 Fed.Reg. 25,622 (1993); *Thailand*, 58 Fed.Reg. 25,625 (1993); *Antifriction Bearings (Other Than Ta-* *pered Roller Bearings) and Parts Thereof From the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Order (In Part)*, 58 Fed. Reg. 25,627 (1993); *Ball Bearings and Parts Thereof From Romania Preliminary Results of Antidumping Duty Administrative Review*, 58 Fed. Reg. 25,630 (1993).

denied NTN's claimed interest income offsets to interest expense in calculating COP and CV; (9) calculated difference in merchandise on the basis of total costs of manufacture; (10) excluded NTN's home market sales to related parties when calculating FMV; and (11) included needle roller bearings with a ratio of between 3:1 to 4:1 in the scope of the antidumping duty order. *Plaintiffs NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation 56.2 Motion for Judgment on the Agency Record and Memorandum in Support Thereof ("NTN's Brief")* at 1–36.

On October 20, 1993, the Court granted NTN's motion for a preliminary injunction, enjoining the liquidation of NTN's Japan-origin unliquidated entries of AFBs during the pendency of this litigation.

On September 27, 1993, and September 30, 1993, respectively, the Court granted The Torrington Company's ("Torrington") and Federal–Mogul Corporation's ("Federal–Mogul") motions to intervene in this civil action. Torrington, the petitioner in the original investigation, and Federal–Mogul, a U.S. manufacturer of AFBs, oppose NTN's challenge.

## DISCUSSION

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. Deduction for Direct Selling Expenses from Exporter's Sales Price

■ In the underlying review, Commerce deducted NTN's United States selling expenses from United States price ("USP") in exporter sales price sales. *Final Results*, 58 Fed.Reg. at 39,778.

NTN asserts that Commerce should have instead added direct selling expenses to FMV. According to NTN, Commerce's treatment of these expenses is contrary to the Court's decision in *NTN Bearing Corp. v. United States*, 17 CIT 272, Slip Op. 93–56, 1993 WL 129799 (Apr. 21, 1993) and many other cases. *NTN's Brief* at 8.

In response, Commerce argues that 19 U.S.C. § 1677a(e)(2) (1988) "specifically requires Commerce to reduce exporter's sales price by 'expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise.'" *Defendants' Memorandum in Opposition to the Motion of NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation for Judgment upon the Agency Record ("Commerce's Brief")* at 6. Commerce has interpreted the words "expenses generally incurred by ... the exporter in the United States" which are contained in 19 U.S.C. § 1677a(e)(2), to include direct and indirect selling expenses related to United States sales. *Id.*

In *Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed.Cir.1994), the United States Court of Appeals for the Federal Circuit ("CAFC") agrees with Commerce's position on this question. The CAFC states:

In an exporter's sales price transaction, after an initial exporter's sales price is calculated, that value is adjusted, *inter alia*, pursuant to section 1677a(e)(2) by deducting therefrom all selling expenses (both direct and indirect) incurred in making U.S. sales. Then, in determining an initial foreign market value, appropriate sales are identified in the home market or

third country pursuant to 19 U.S.C. § 1677b(a) [ (1988) ]. Next, the initial foreign market value is adjusted, *inter alia*, by deducting therefrom a "circumstances of sale" amount to account for "any difference between the United States price and the foreign market value," 19 U.S.C. § 1677b(a)(4), for example, direct selling expenses incurred in making home market sales. In this way, the section 1677b(a)(4) adjustment to foreign market value counterbalances the section 1677a(e)(2) adjustment to exporter's sales price. As a result, the two parameters may be compared on equivalent terms.

*Koyo Seiko Co.*, 36 F.3d at 1573.

The CAFC found that Commerce's statutory interpretation "accounts for the inherently different nature of purchase price and exporter's sales price" and it isn't "surprising that Commerce feels the need to treat them differently to make a fair comparison." *Id.* at 1574. Further, "[n]othing in the plain language or the legislative history of the Antidumping Act precludes Commerce's approach of adjusting exporter's sales price by deducting therefrom certain direct selling expenses incurred in the United States. Indeed, Commerce's stated rationale for its approach is well within the bounds of reasonableness." *Id.* at 1575.

In light of the CAFC's decision in *Koyo Seiko*, 36 F.3d at 1565, the Court sustains Commerce's deduction of NTN's direct selling expenses incurred in the United States from exporter's sales price as being in accordance with law. *See NTN Bearing Corp. of Am. v. United States*, 19 CIT ——, ——, Slip Op. 95–156 at 9–10, 903 F.Supp. 62, 66–67 (Sept. 6, 1995). *See also Koyo Seiko Co. v. United States*, 19 CIT ——, ——, 898 F.Supp. 915, 922–923 (1995).

2. *Re-exports*

▮ In the Final Results, Commerce refused to instruct Customs to refund NTN's cash deposits for merchandise allegedly re-exported before sale to an unrelated party in the United States. *Final Results*, 58 Fed. Reg. at 39,738.

NTN maintains that Commerce unlawfully refused to instruct Customs to refund NTN's antidumping duty deposits paid on merchandise entered by a related party and re-exported without a sale occurring in the United States to an unrelated party. *NTN's Brief* at 10. NTN argues that the Court has previously held that "there is no basis in the statute for the assessment of antidumping duties on imports to the U.S. of the subject merchandise by related parties which are subsequently re-exported without a sale occurring in the U.S." *NTN's Brief* at 10 (quoting *Torrington Co. v. United States*, 17 CIT 199, 212, 818 F.Supp. 1563, 1574 (1993)). NTN asserts that *Torrington* is consistent with many court decisions which hold that the antidumping laws are remedial in nature. *NTN's Brief* at 10 (relying on *Badger–Powhatan v. United States*, 9 CIT 213, 216, 608 F.Supp. 653, 656 (1985); *Bomont Indus. v. United States*, 13 CIT 546, 550, 718 F.Supp. 958, 962 (1989)). NTN argues that where there is no sale in the United States, as is the case here, the United States industry has not been injured by sales of foreign merchandise at less than fair value. *NTN's Brief* at 10 (citing 19 U.S.C. § 1673 (1988)).

NTN insists that antidumping duties deposited at the time of entry should be refunded if at liquidation, a party can show that merchandise covered by certain entries was exported before sale to an unrelated party in the U.S. According to NTN, Commerce denied its claimed adjustment for re-exported merchandise based on NTN's failure to submit information which was never requested. *Id.*

In its determination, Commerce explained: "Because NTN has failed to demonstrate that any of its sales are re-exported by its related U.S. subsidiary, we have not excluded any of NTN's imports from our analysis and will therefore not order Customs to refund cash deposits made by NTN on that merchandise." *Final Results*, 58 Fed.Reg. at 39,738.

Commerce agrees that antidumping duties should not be assessed against merchandise imported by a party related to a respondent and re-exported without a sale to an unrelated party having occurred in the United States. *Commerce's Brief* at 8. However,

Commerce maintains that the determination of whether such sales have taken place, and the calculation of an adjustment for such sales, is for Commerce to make. *Id.* Commerce further asserts that NTN never provided evidence of actual re-exports. According to Commerce, it was NTN's responsibility to report such re-exports in time for Commerce to verify the claim and quantify the adjustment. *Id.*

■ The statutory scheme clearly places the responsibility for making determinations concerning re-exportation of merchandise on Commerce rather than on Customs. Determinations regarding the amount of dumping duties owing on merchandise is to be made by Commerce under 19 U.S.C. § 1673e (1988). Further, the question of whether merchandise was re-exported is a factual question subject to Commerce's verification. *Id.* Commerce is deprived of the opportunity to verify the accuracy of claimed re-exports if respondents do not reveal that merchandise was re-exported during the period of review ("POR") until the time of liquidation, after the review is completed.

Although NTN presumably knew from the beginning of the administrative review that it had re-exported merchandise during the POR, NTN failed to alert Commerce until long after the time for submission of new factual information had lapsed. Commerce must know that merchandise was actually re-exported. NTN provided Commerce no basis upon which to make that determination. NTN merely asserted that it had such re-exports. Erroneously, NTN now attempts to place the burden on Commerce to seek information concerning re-exports. However, it is well-established that a party claiming an adjustment has the responsibility of providing Commerce with factual information to support the claim. *See Timken Co. v. United*

*States,* 11 CIT 786, 804, 673 F.Supp. 495, 513 (1987). *See also Timken Co. v. United States,* 18 CIT ——, ——, 852 F.Supp. 1122, 1126 (1994); *NTN Bearing Corp. of Am. v. United States,* 17 CIT 1149, 1157, 835 F.Supp. 646, 652 (1993). As NTN did not provide record support for its claimed re-exports, Commerce's rejection of NTN's claimed adjustment for re-exported merchandise is reasonable and in accordance with law.

### 3. *Ordinary Course of Trade*

■ In this review, NTN's reported data identified, for exclusion from the home market database, certain sales as made outside the ordinary course of trade. *NTN's Brief* at 12–14. These coded sales included sample sales and other zero price or small-quantity sales. Commerce, however, found NTN's evidence insufficient to support the claim that the coded sales were made outside the ordinary course of trade. *Final Results,* 57 Fed. Reg. at 38,775. Consequently, Commerce included these sales in the calculation of FMV. *Id.*

NTN argues that 19 U.S.C. § 1677b(a)(1) [2] requires that Commerce exclude these sales from the home market database prior to calculating FMV. *NTN's Brief* 12–14. To justify its claimed exclusion, NTN argues that the intent of the parties to the transaction is the overriding factor in determining whether sales are sample sales. *Id.* at 13. NTN also contends that because Commerce excluded its sample sales and small quantity sales as not in the ordinary course of trade in another proceeding, it should have done so in the instant case as well. *Id.* at 12–14 (citing to *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Admin-*

2. According to 19 U.S.C. § 1677b(a)(1):
 The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...
 (A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the *usual commer-*

*cial quantities* and in the *ordinary course of trade* for home consumption....
 19 U.S.C. § 1677b(a)(1)(A) (emphasis added).
 Ordinary course of trade is defined as:
 the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind.
 19 U.S.C. § 1677(15) (1988).

*istrative Review,* 57 Fed.Reg. 4,951 (1992)). Finally, NTN argues that it substantiated its claim by reporting quantities involved, frequency of transactions, design specifications, customer information and dates of sale. *NTN's Brief* at 13–14.

Torrington and Federal–Mogul support Commerce's denial of an exclusion for NTN's sales allegedly made outside the ordinary course of trade. *Memorandum of The Torrington Company in Opposition to Motion for Judgment on the Agency Record ("Torrington's Brief")* at 11–18; *Opposition of Federal–Mogul Corporation, Defendant–Intervenor, to Plaintiffs' Motion for Judgment on the Agency Record ("Federal–Mogul's Brief")* at 7–14.

Commerce expressed its position on this issue in the Final Results, stating:

19 U.S.C. 1677b(a)(1)(A) and 19 CFR 353.46(a) [ (1993) ] provide for the exclusion from the calculation of FMV sales made outside the ordinary course of trade. In accordance with Department practice, respondents bear the burden of proving that foreign market sales were made outside the ordinary course of trade. See *Murata [Mfg. Co., Ltd. v. United States,* 820 F.Supp. 603, 606], Slip Op. 93–53 at 8 [ (CIT 1993) ], and *Nachi[–Fujikoshi Corp. v. United States* ], 798 F.Supp. [716] at 718 [ (CIT 1992) ]. In these reviews, various respondents requested that the Department designate certain foreign market sales as being outside the ordinary course of trade because the sales involved sample and prototype merchandise. The fact that a respondent has identified merchandise as being a sample or prototype, however, is insufficient to render the sales of such merchandise outside the ordinary course of trade. Therefore, we have examined whether to exclude sales of such bearings from our FMV calculations on the basis of the extent to which respondents have satisfied their burden of proof by providing specific evidence that such sales fall outside the ordinary course of trade....

For the purposes of this review, we have applied the standard set forth in *Murata,* in which the CIT quoted with approval the statement in *Indian Pipes and Tubes,* 56

FR at 64755, that the Department does not rely on one factor taken in isolation but rather considers all the circumstances particular to the sales in question in determining whether they are outside the ordinary course of trade. In *Murata,* the CIT noted that, in other cases, the Department had determined that sales were outside the ordinary course of trade not only due to the presence of smaller quantities and higher prices, but also because the Department found, for example, that prices for sample sales were determined separately from standard price lists, that customers purchased products for trial or evaluation purposes, or that sales were cancelled prior to invoicing....

. . . .

We agree with Torrington that NTN's sample sales should be included in the calculation of FMV. As stated above, the fact that respondent identified sales as sample and prototype sales does not necessarily render such sales outside the ordinary course of trade. Thus, the verification of the designation of certain sales as samples merely proves that respondent identified sales recorded as samples in its own records. Such evidence does not indicate that such sales were made outside the ordinary course of trade for purposes of calculating FMV in these reviews. Accordingly, we have included NTN's sample sales in the calculation of FMV.

We also disagree with NTN's claim that sales of products with a sporadic sales history fall outside the ordinary course of trade. Infrequent sales of small quantities of certain models is insufficient evidence to establish that sales were made outside the ordinary course of trade. Thus, because NTN failed to satisfy its burden of proof in accordance with the standard set forth above, we have not excluded sales identified by NTN as outside the ordinary course of trade from the calculation of FMV.

*Final Results,* 58 Fed.Reg. at 39,774–75.

The Court finds that NTN's characterization of its reported data is not substantiated by the administrative record. NTN's sales information merely identifies certain sales as

home market sample sales and other sales (including sample sales, sales with zero price, and sales that were infrequent) as not in the ordinary course of trade. NTN examined only quantity and frequency of sales in determining which sales to report as outside the ordinary course of trade.[3] Japan C.R. Document No. 50, Fiche 257, Frames 45, 46. NTN's deficiency questionnaire response provided no additional information. It merely identified sales as having been made outside the ordinary course of trade. Japan P.R. Document No. 293, Fiche 111–12, Frames 92, 10, 11.

██ Without a complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade, Commerce cannot exclude those sales from FMV. "This is particularly true with respect to a blanket classification of such sales as prototype without individual justification." *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From The Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 31,692, 31,713 (1991). Further, the determination of "whether home market sales are in the ordinary course of trade requires evaluating not just 'one factor taken in isolation but rather ... all the circumstances particular to the sales in question.'" *CEMEX, S.A. v. United States*, 19 CIT ——, ——, 1995 WL 251561, Slip Op. 95–72 at 6 (Apr. 24, 1995) (citing *Murata Mfg. Co. v. United States*, 17 CIT 259, 264, 820 F.Supp. 603, 607 (1993)) (quoting *Certain Welded Carbon Steel Standard Pipes and Tubes From India, Final Results of Antidumping Duty Administrative Reviews*, 56 Fed.Reg. 64,753, 64,755 (1991)). The Court agrees with Commerce that the mere designation of sales as samples in a respondent's records is not controlling.

██ In addition, Commerce's treatment of sales in another proceeding is irrelevant to this case. The Court has stated that "Com-

merce's determinations must be examined on an individual basis taking into account all of the relevant facts of each case." *NTN Bearing Corp.*, 19 CIT at ——, Slip Op. 95–156 at 15, 903 F.Supp. at 68 (quoting *Nachi–Fujikoshi Corp. v. United States*, 16 CIT 606, 609, 798 F.Supp. 716, 719 (1992)). Likewise, each respondent's record data stands on its own merit.

As NTN inadequately substantiated its claim, Commerce properly declined to exclude from the home market database, certain sales identified by NTN as made outside the ordinary course of trade. The Court sustains Commerce's decision as supported by substantial evidence and in accordance with law. *See NTN Bearing Corp.*, 19 CIT at ——, Slip Op. 95–156 at 16, 903 F.Supp. at 68–69. *See also Timken Co. v. United States*, 18 CIT ——, ——, 865 F.Supp. 850, 853 (1994); *Nachi–Fujikoshi*, 16 CIT at 608–09, 798 F.Supp. at 719.

### 4. Comparison of Sales Across Different Levels of Trade

██ In this review, NTN reported sales made at three levels of trade: original equipment manufacturers, distributors and after-market. Commerce, however, compared U.S. and home market sales across different levels of trade. *Final Results*, 57 Fed.Reg. at 38,767–68. NTN claims that Commerce unlawfully compared sales at different levels of trade. NTN also argues that Commerce failed to provide a written explanation for its decision to cross trade levels. *NTN's Brief* at 14–17. In particular, NTN is concerned that Commerce may not have considered the commercial value of the merchandise at issue. According to NTN, the administrative record is void of evidence indicating that the merchandise sold at different levels of trade is of approximately equal commercial value. *Id.* at 16. *See also* 19 U.S.C. § 1677(16)(B)(iii) (1988).[4]

In response, Commerce maintains that its decision to cross trade levels was proper and

---

3. The abbreviations "P.R." and "C.R." refer to the administrative public and confidential records, respectively. The identifier "Japan" signifies the country specific record, otherwise, reference is to "Gen. Issues" (*i.e.*, general issues).

4. *See infra* p. 1092 n. 6.

amply explained on the record. *Commerce's Brief* at 23–25. In addition, Commerce asserts that neither 19 U.S.C. § 1675 (1988), nor 19 U.S.C. § 1677b (1988), nor 19 U.S.C. § 1677(16) identifies the level of trade at which "such or similar" merchandise is sold as relevant to the calculation of FMV or comparison of FMV with USP. *Id.* at 23.

Title 19, United States Code, section 1675(a) requires Commerce to calculate the difference between the foreign market value and the United States price of the imported merchandise.[5] Foreign market value is defined as the price "at which such or similar merchandise is sold" in the country of exportation or to third countries. *See* 19 U.S.C. § 1677b(a)(1)(A). Before calculating FMV, Commerce must first identify, for each U.S. sale, a comparison home market sale. Congress addressed the selection of "such" or identical merchandise in 19 U.S.C. § 1677(16).[6] If identical merchandise, as defined in § 1677(16) is not available, Commerce must then proceed to select similar merchandise as defined in subsections (B) or (C) of that section. Levels of trade are referred to in Commerce's regulation, 19 C.F.R. § 353.58 (1993) which provides:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and make appropriate adjustments for differences affecting price comparability.

In this case, Commerce appropriately took commercial value into consideration in selecting "such or similar merchandise" for comparison and not with respect to its decision to cross levels of trade. *See Commerce's Brief* at 26 n. 7 (explaining its use of the twenty percent cost test to ascertain approximate equal commercial value when matching home market and U.S. models).

Further, contrary to NTN's allegation, Commerce provided ample record explanation of its decision to cross levels of trade. Commerce's Final Results state:

> The Department is required by 19 CFR 353.58 to compare merchandise at different levels of trade *if sales at the same commercial level of trade do not permit an adequate comparison.* Import Administration Policy Bulletin 92/1, July 29, 1992. Accordingly, *when we were unable to compare NTN's U.S. sales to home market sales of such or similar merchandise at the same level of trade,* we attempted to find sales of such or similar merchandise at the next most similar level of trade.

*Final Results,* 58 Fed.Reg. at 39,767–68 (emphasis added). Therefore, Commerce fulfilled its obligation to search the same level of trade for comparison of U.S. and home market sales.

The Court has, on several occasions, affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. *See, e.g., NTN Bearing Corp.,* 19 CIT at ——, Slip Op. 95–156 at 19–20, 903 F.Supp. at 70; *NTN Bearing Corp. of Am. v. United States,* 18 CIT ——, ——, 881 F.Supp. 584, 590–91 (1994). *See also NTN Bearing Corp. of Am. v. United States,* 18 CIT ——, ——, 858 F.Supp. 215, 220–21 (1994); *Koyo Seiko Co. v. United States,* 17 CIT 474, 477, 840 F.Supp. 136, 139–40 (1993), *aff'd,* 20 F.3d 1156 (Fed.Cir.1994).

> (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
> (B) Merchandise—
>
> . . . . .
>
> (iii) approximately equal in commercial value to that merchandise.

---

**5.** 19 U.S.C. § 1675(a) pertains to periodic administrative reviews.

**6.** Section 1677 provides:
**(16) Such or similar merchandise**
The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of the subtitle can be satisfactorily made:

In this case, NTN has not provided, nor has the Court uncovered, any support for its argument that Commerce's disregard of levels of trade differences is contrary to law. Hence, as NTN has shown no basis for the Court to require Commerce to limit its comparison of sales across different levels of trade in which the sales occur, this Court sustains Commerce's comparison of sales across different levels of trade as in accordance with law.

### 5. Level-of-Trade Adjustment

In addition to crossing levels of trade, Commerce declined to grant NTN a level-of-trade adjustment for alleged (1) price differences attributable to differences in levels of trade and (2) indirect selling expense variances according to trade levels. *Final Results,* 57 Fed.Reg. at 39,768.

■ NTN claims that if Commerce may compare sales at different levels, it must make a price-based adjustment to FMV to compensate for price differences in each of the trade levels. *NTN's Brief* at 17. NTN points to various record documents to support its claimed adjustment for price differentials. *Id.* NTN asks that Commerce be required to explain why NTN did not adequately demonstrate that its price differences among the trade levels are due to difference in levels of trade and to state what proof would suffice to quantify the claimed adjustment. *Id.* at 19.

In addition, NTN claims that Commerce must consider price and indirect selling expenses in making adjustments to compensate for differences affecting price comparability. *Id.* at 18. *See also* 19 C.F.R. § 353.58. NTN claims that Commerce's denial of any level-of-trade adjustment is inconsistent with its past practice. *Id.* at 20. According to NTN, its record support for the claimed adjustment is consistent with data it produced in the second administrative review and in the investigation where Commerce had no difficulty quantifying the amount of the level-of-trade adjustment. *Id.*

Federal–Mogul criticizes the methods that NTN used to quantify its claimed adjustments and argues that NTN did not demonstrate entitlement to a level-of-trade adjustment quantified as the difference in selling prices. *Federal–Mogul's Brief* at 14–21.

When Commerce compares sales at differing levels of trade, it is authorized to make a circumstance of sale adjustment pursuant to 19 U.S.C. § 1677b(a)(4)(B). The implementing regulation for this provision states that:

> [i]n calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference.

19 C.F.R. § 353.56(a)(1) (1993).

Commerce explained to the Court's satisfaction why NTN's reported data was inadequate. Pointing out the data's insufficiency, Commerce stated:

> [R]espondents must quantify any price differentials that are directly attributable to differences in levels of trade. Although NTN contends that the Department can make a level of trade adjustment on the basis of price differences, NTN has failed to demonstrate what portion, if any, of those price differences is attributable to differences in levels of trade.

*Final Results,* 58 Fed.Reg. at 39,768. The Court agrees that the record does not sufficiently support NTN's claim for an adjustment based on price differentials. None of the worksheets submitted by NTN explain what part, if any, of the price differences between merchandise sold at the different levels of trade are attributable to differences in levels of trade rather than to other factors. *See* Exhibit B–10, Japan C.R. Document No. 28, Fiche 234, Frame 88; Worksheets Nos. 4A, 4B, 5 and 7A, Japan C.R. Document No. 28, Fiche 235, Frames 4–6, 8; Exhibit C–3, Japan C.R. Document No. 50, Fiche 255, Frame 5.

In *NTN Bearing Corp.,* 17 CIT at 1154, 835 F.Supp. at 650, the Court was also faced with a claim by NTN for a level-of-trade adjustment for price differentials and/or an explanation of why its claim was inadequate. In upholding Commerce's denial of a level-of-

trade adjustment, the Court focused on Commerce's position that:

"NTN's contention that a level of trade adjustment should be based on the measurable difference in prices across levels does not address the issue of whether the difference in price is due purely to the difference in level of trade, or whether any other factors are affecting the difference in price."

(Quoting *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 41,508, 41,512 (1991)). Similarly, in this case, the Court upholds Commerce's denial of a price-based level-of-trade adjustment because NTN failed to adequately support its claimed price differentials attributed to differences in levels of trade.

 Further, there is no statutory requirement that Commerce make a level-of-trade adjustment when comparing sales at different trade levels. *Koyo Seiko Co.,* 17 CIT at 477, 840 F.Supp. at 139.

Therefore, because NTN failed to quantify its claimed level-of-trade adjustment, Commerce's denial of a circumstance of sale price-based adjustment is supported by substantial evidence and in accordance with law.

6. *Indirect Selling Expenses*

 In addition to denying NTN a price-based level-of-trade adjustment, Commerce concluded that NTN's request for a level-of-trade adjustment using indirect selling expenses was

similarly flawed, because NTN's allocation of a common pool of fixed expenses to different levels of trade using relative sales value demonstrates that these expenses do not vary according to levels of trade. Because NTN has failed to quantify adequately a level-of-trade adjustment, we have not adjusted FMV for differences in levels of trade.

*Final Results,* 58 Fed.Reg. at 39,768.

NTN asserts that Commerce improperly rejected its allocation methodology in calculating U.S. and home market selling expenses. *NTN's Brief* at 22. Pointing out

that Commerce accepted its reporting methodology in previous administrative reviews and in the investigative phase of this case, NTN argues that Commerce's current change in policy is abrupt and unexplained. *Id.* at 23. NTN cites *Shikoku Chems. v. United States,* 16 CIT 382, 388, 795 F.Supp. 417, 421 (1992), for the proposition that, at some point, Commerce's methodology must become the law of the case. *Id.* NTN asks that its margins be recalculated using its reported expense data because, Commerce's reallocation methodology "is clearly at odds with the administrative record and distorts the expense ratios." *Id.*

Federal–Mogul and Torrington both comment that it was "distortions" caused by NTN that compelled Commerce to reallocate NTN's selling expenses without regard to levels of trade. *Id.* at 21; *Torrington's Brief* at 28. Federal–Mogul also maintains that NTN did not demonstrate entitlement to a level-of-trade adjustment based on indirect selling expense differentials. *Federal–Mogul's Brief* at 17–21. Torrington contends that NTN's failure to provide verifiable evidence of differences in selling expenses at the individual home market trade levels eliminated the only possible basis for a level-of-trade adjustment. *Torrington's Brief* at 35.

Commerce defends its decision to reallocate NTN's home market and U.S. indirect selling expenses over respective total sales value. Commerce points out that its long-established practice has been to accept a respondent's accounting methodology so long as that methodology is reasonable and is used in the respondent's normal course of business. According to Commerce, this practice is intended to obtain pricing information that is as accurate as possible. *Commerce's Brief* at 40. However, it is Commerce's position that NTN's reported indirect selling expenses according to levels of trade were based on an allocation methodology that was unreasonable and not reflective of actual costs incurred. *Id.*

The Court agrees with Commerce that NTN inadequately supported its level-of-trade adjustment claim for indirect selling expenses. Although NTN purports to show that it incurred different selling expenses for

different trade levels, the record demonstrates that NTN's allocation methodology does not reasonably quantify the expenses incurred at each level of trade. *See* Worksheets Nos. 4A, 4B and 5, Japan C.R. Document No. 28, Fiche 235, Frames 4–6; Japan C.R. Document No. 28, Fiche 234, Frame 85; Exhibit C–3, Japan C.R. Document No. 50, Fiche 258, Frame 5.

█ Further, NTN's reliance on *Shikoku Chems.*, 16 CIT at 388, 795 F.Supp. at 421, is misplaced. *Shikoku* dealt with an attempt by Commerce to modify its methodology in the advanced stages of an antidumping proceeding. At issue, specifically, were the fifth and sixth administrative reviews of *Cyanuric Acid and its Chlorinated Derivatives From Japan; Final Results of Antidumping Duty Administrative Reviews, and Revocation on Trichloro Isocyanuric Acid and Revocation in Part on Dichloro Isocyanurates*, 56 Fed. Reg. 19,338 (1991). The respondent's dumping margins for the previous three consecutive periods of sales had been *de minimis.* In the fifth and sixth administrative reviews, however, Commerce altered its methodology for calculating home market packing costs, resulting in barely above-*de minimis* margins. *Shikoku Chems.*, 16 CIT at 383–84, 795 F.Supp. at 418. In this factual context, the court found Commerce's change in approach unsupported. Importantly, in *Shikoku*, plaintiffs established their reliance on Commerce's previous methodology consistently applied in several reviews. *Id.* at 386, 795 F.Supp. at 420 (stating, "[t]he record contains evidence that plaintiffs adjusted their prices in accordance with methodology consistently applied by Commerce in an attempt to comply with United States antidumping law"). The court concluded that it was "simply too late to mandate another three years of administrative reviews because of a last minute 'improvement' in Commerce's methodology." *Id.* at 388, 795 F.Supp. at 422. In distinct contrast to the facts in *Shikoku*, this case concerns only the third administrative review and NTN does not point to any record evidence of detrimental reliance on Commerce's methodology in the investigation or in previous reviews.

Furthermore, by rejecting NTN's flawed selling expenses allocation in this review, Commerce obviously came to the conclusion that it had erred in accepting NTN's methodology previously. The Court notes that in *Shikoku*, the court explicitly recognized that if the original error was significant, "perhaps fairness to petitioners in antidumping investigations would warrant correction at even this late date." *Id.* at 388, 795 F.Supp. at 422. As Commerce found NTN's allocation methodology factually unsound, Commerce's change in methodology in this review was a reasonable exercise of agency discretion. *Cf. NSK Ltd. v. United States*, 19 CIT ——, ——, 896 F.Supp. 1263, 1275–76 (1995).

Accordingly, the Court denies NTN's request for a remand for recalculation of its margins using expense data as reported by NTN. Commerce's denial of a level-of-trade adjustment based on indirect expenses for NTN is affirmed.

### 7. Depreciation on Idled Equipment

█ Next, NTN takes issue with Commerce's inclusion of depreciation on idled equipment in the calculation of constructed value and cost of production. *NTN's Brief* at 24–25. NTN explains that, in accordance with generally accepted accounting principles ("GAAP") in Japan, this expense is not recorded on its company's books. NTN argues that Commerce's inclusion of an imputed expense for theoretical depreciation on idled equipment is contrary to *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1060 (Fed.Cir. 1992), where the CAFC held that constructed value must include all *actual* production costs. *Id.*

In its final determination, Commerce rejected NTN's argument, stating:

We include in the fully absorbed factory overhead the depreciation of equipment not in use or temporarily idle. While Japan's accounting methodology does provide that depreciation for idle equipment may be stopped, we do not accept this accounting method because idle fixed assets are a cost to the company.... Based on the information in NTN's supplemental response, we have calculated depreciation expenses on NTN's idle assets and included

them in the calculation of NTN's COP/CV for these final results.

*Final Results,* 58 Fed.Reg. at 39,756.

Commerce further explains that it will not rely on a respondent's home country's GAAP if these principles do not recognize a company's actual costs or distort those costs. *Commerce's Brief* at 42–43.

This Court sustained Commerce's similar treatment of depreciation on idled equipment in *NTN Bearing Corp. v. United States,* 17 CIT 713, 721, 826 F.Supp. 1435, 1442 (1993), *appeal docketed,* No. 94–1186, —— F.3d —— (Fed.Cir.1994), stating:

> These costs, however, are costs involved in the ordinary course of business. The fact that the costs of depreciation from idled assets and the disposal of fixed assets are not recorded in NTN's books and records is irrelevant to whether these costs are actually incurred and should be included in NTN's cost of production. Furthermore, to not include them would distort the company's financial position.

NTN has articulated no convincing new argument to persuade the Court to reconsider its decision in *NTN Bearing Corp.,* 17 CIT at 713, 826 F.Supp. at 1435. Therefore, the Court sustains Commerce's treatment of depreciation on idled equipment in calculating COP and CV.

### 8. *Interest Expense Offset*

■ In this review, NTN claimed an interest income offset for interest income. Commerce disallowed the claimed interest income offset stating: "Since NTN did not differentiate between interest income derived from investment activity as opposed to bearing manufacturing operations in its calculation of net interest expense, we have disallowed an offset to interest expense in the calculation of COP and CV." *Final Results,* 58 Fed.Reg. at 39,756–57.

NTN challenges Commerce's disallowance of an offset to interest expense for interest income. *NTN's Brief* at 25–27. NTN relies on *Timken Co. v. United States,* 18 CIT ——, ——, 852 F.Supp. 1040, 1048 (1994), where the Court stated that Commerce's "standard practice has been to require re-spondents to show that interest income is related to the *general operations* of the firm in order for that interest income to be used to offset interest expenses in the calculation of COP". *NTN's Brief* at 25 (emphasis added). NTN asserts that Commerce failed to apply the test set forth in *Timken.* NTN points out that, in *Timken,* neither respondent was able to tie interest income to the manufacture of bearings. *Id.* at 26. NTN also argues that Commerce's denial of the claimed offset is either a departure from Commerce's previous methodology or an aberration from its standard practice. *Id.* at 25–27. Lastly, NTN argues that, as it reported this adjustment in the preceding reviews and its information was verified, Commerce should have given it an opportunity to explain or clarify its responses in this review. *Plaintiffs' Reply to the Responses of Defendant and Defendant–Intervenors to Plaintiffs' Motion for Judgment on the Agency Record* at 14–15.

In rebuttal, Commerce argues that its reference to "bearing manufacturing operations" in the Final Results does not indicate that NTN was required to tie its claimed interest income offset to the production of subject merchandise. Commerce maintains that the phrase merely refers to NTN's ordinary operations. *Commerce's Brief* at 48. In addition, Commerce explains that it generally allows an offset to interest expense for interest income earned from a company's general operations. *Id.* at 45 (citing *Timken,* 18 CIT at ——, 852 F.Supp. at 1048, and cases cited therein). However, Commerce points out that interest income which is unrelated to a company's operations, such as interest income earned from investment activities, is not allowed as an offset. *Id.* at 45–46.

Torrington argues that NTN's response disregarded the clear requirements of Commerce's questionnaire. Torrington also points out that Commerce used NTN's actual interest figure, derived from data supplied by NTN, instead of applying adverse "best information" because of the deficiencies in NTN's response. In addition, Torrington states that offsets should relate to interest income earned from a company's operations,

not from its investment activities. *Torrington's Brief* at 43–46.

In *Timken,* the Court found Commerce's standard practice has been to require respondents to "show that interest income is related to the general operations of the firm in order for that interest income to be used to offset interest expenses in the calculation of COP." *Timken,* 18 CIT at ——, 852 F.Supp. at 1048. NTN failed to meet this evidentiary requirement. In addition, the Court finds meritless NTN's implication that by referring to NTN's "bearing manufacturing operations" Commerce applied a narrower test than was applied in *Timken.* NTN mischaracterizes the issue before the Court in *Timken.* In that case, petitioner argued that interest expense could only be offset with interest income tied directly to production of the subject merchandise. *Timken,* 18 CIT at ——, 852 F.Supp. at 1046. Commerce argued, "the correct test is *not* whether the interest income is directly related to production of the subject merchandise but whether the interest income is related to the *ordinary operations* of the company." *Id.* at ——, 852 F.Supp. at 1046 (emphasis added). The Court agreed. *Id.* at ——, 852 F.Supp. at 1048. The Court sees no reason to believe that Commerce's phraseology in the case at bar referred to anything other than NTN's ordinary operations.

Further, Commerce's questionnaire specifically indicated that interest expense could be offset only by "interest income earned from your company's short-term investments of its working capital." Commerce also requested that NTN "[p]rovide a list of the accounts included in the total of the interest income offsetting interest expense." Gen. Issues P.R. Document No. 2 at 78. Disallowance of NTN's claimed offset resulted from NTN's failure to comply with Commerce's standard practice. Specifically, NTN failed to explain what accounts were included in the claimed offset, how the offset was related to manufacturing operations, and notably how "income from *sales* of marketable securities" qualified as interest income appropriate as an offset to interest expenses. *Compare* Japan C.R. Document No. 57, Worksheet No. 5, Fiche 265–67, Frame 44. NTN's ordinary business consists of the manufacture and sale of bearings. Reasonably, Commerce sought a nexus between the reported interest income and NTN's bearing manufacturing operation. NTN did not comply with Commerce's clear request for information necessary to determine whether an interest income offset was allowable.

Accordingly, the Court sustains Commerce's decision to disallow NTN's claimed offset as reasonable, supported by substantial evidence and in accordance with law.

### 9. *Difference in Merchandise Test*

█ In the underlying review, NTN reported variable costs of manufacturing ("VCOM") for products sold in the home market and in the United States. Commerce implemented a twenty percent difference in merchandise ("difmer") test (used to determine whether non-identical products in the U.S. and home markets are sufficiently similar that they may reasonably be compared) by dividing the difmer adjustment by the total costs of manufacture ("COM") of the U.S. product.

NTN contests Commerce's action arguing that Commerce should have adhered to its previous methodology of dividing the difmer adjustment by the VCOM. *NTN's Brief* at 27. According to NTN, dividing the difmer adjustment by the COM results in an unfair comparison of variable costs to total costs. Allegedly, this is unfair because total costs will always be higher than variable costs. *Id.* at 28–29. NTN asserts that, with a higher denominator, the difmer ratio will be reduced increasing the likelihood that dissimilar merchandise will be compared. *Id.* at 29. NTN argues that Commerce's prior methodology resulted in a comparison between variable costs and was more likely to produce a figure representative of differences in the cost of manufacture between two similar products. *Id.*

Commerce explained its rationale for using COM in the denominator in this review, stating:

> The total COM is an appropriate point of reference for the 20–percent difmer test. We are measuring the physical differences in merchandise, for which we make an

adjustment pursuant to 19 CFR 353.57. Since differences in VCOM are primarily attributable to physical differences in merchandise, it is appropriate to use VCOM in the numerator.

The purpose of choosing the total COM as the point of reference is to provide a stable benchmark against which the absolute size of the physical difference in merchandise can be compared in order to determine if the difference is so large that the two products being compared cannot be considered similar for the purposes of the model match. We are not using the price of the U.S. model as this benchmark because the price of the model may be distorted if the model is sold at less than foreign market value in the United States. Total COM is preferable to VCOM as a point of reference because it more closely approximates the value of the model.

*Final Results,* 58 Fed.Reg. at 39,766.

Commerce maintains that its current approach is "consistent with the policy bulletin." *Commerce's Brief* at 53. Commerce also asserts that since neither the statute nor the regulations provide guidance on how dissimilar merchandise must be before it cannot be considered "similar," Commerce must make that determination. *Id.* at 51.

The Court recently resolved this issue in *NTN Bearing Corp. v. United States,* 19 CIT ——, ——, 898 F.Supp. 923, 925–27 (1995). In that case, Commerce had divided the difmer adjustment by the total COM of the U.S. product and then used a twenty percent cap as the benchmark for determining comparability. *See NTN Bearing Corp.,* 19 CIT at ——, 898 F.Supp. at 925–27. In its decision, the Court held that, as neither the statute nor the regulations limits the difmer test to VCOM as the denominator, Commerce has broad discretion in determining what constitutes "similar" merchandise. The Court stated that, although Commerce's formula for performing the twenty percent difmer cap had varied over the years, its July 1992 policy bulletin established a consistent policy for performing the test. Accordingly, the Court affirmed Commerce's model match methodology which divided the difmer ad-

justment by the total COM of the U.S. product. *See id.* at ——, 898 F.Supp. at 926–27.

The Court adheres to its decision in 898 F.Supp. 923 and finds that Commerce acted appropriately in dividing the difmer adjustment by the total costs of manufacturing the U.S. product. Commerce's decision on this issue is sustained as reasonable and in accordance with law.

### 10. *Arm's–Length Test*

■ In the underlying review, NTN reported home market sales to related and unrelated parties. It also requested that Commerce consider factors other than strict price comparisons when determining whether sales prices to related and unrelated parties were comparable. *See* Japan C.R. Document No. 214, Fiche 339, Frames 45–48. However, Commerce excluded NTN's related party sales of ball and cylindrical roller bearings when calculating FMV, stating:

> We ... revised the "arms-length" test that we used for our preliminary analysis. Specifically, we deducted from gross prices all charges and direct selling expenses to calculate the prices used in our "arms-length" test. We also conducted this test according to NTN's reported levels of trade. Using our revised analysis, *we found that related party prices for ball and cylindrical roller bearings were lower than unrelated party prices. Therefore, for these two classes or kinds of merchandise, we excluded related party sales from our analysis. We included related party sales of spherical plain bearings in our analysis, because related party prices exceeded prices to unrelated parties.*

*See* Japan P.R. Document No. 565 ("*Final Results Memo*"), Fiche 159, Frames 59, 65 (emphasis added).

In the Final Results, Commerce further stated:

> [I]t has been our longstanding practice to conduct an arm's-length test independently *to determine whether prices to related parties in foreign markets are equal to or higher than prices to unrelated parties in those markets.*

Although we revised our arm's-length test to account for certain factors highlighted by NTN, we found nonetheless that NTN's prices to related parties were, for the vast majority of home market sales, lower than those to unrelated parties. Therefore, we have excluded NTN's home market sales to related parties from our analysis for these final results.

*Final Results,* 58 Fed.Reg. at 39,770–71 (emphasis added).

NTN acknowledges that Commerce attempted to develop a more reasonable test than a pure price comparison but takes issue with Commerce's application of the related-party test nevertheless. First, NTN argues that Commerce failed to apply the objective standard of 19 C.F.R. § 353.45 (1993) in measuring price differences to determine whether prices were "comparable." NTN claims that the regulation requires only that prices be comparable, not greater or the same. NTN also argues that "comparable" does not mean higher or lower in price. *NTN's Brief* at 30.

Next, NTN claims that Commerce should have considered factors other than price in determining whether to include related party sales when calculating FMV. Specifically, NTN argues that Commerce erred in failing to examine: (1) the way in which the buyer and the seller organize their commercial relations; (2) the way in which the parties arrive at the price in question; (3) whether the price was settled in a manner consistent with the normal pricing practices of the industry in question; (4) whether the price was settled in a manner consistent with the way the seller settles prices for sales to unrelated buyers; and (5) whether it was demonstrated that the price was adequate to ensure recovery of all costs plus a profit. According to NTN, all of these factors influence the price of a related party transaction and Commerce cannot make meaningful price comparisons without examining them. *Id.* at 29–31.

NTN also criticizes Commerce for having compared sales when the identical bearing model was sold to unrelated and related parties. According to NTN, because such sales represent only a small number of total models sold, Commerce's methodology is unrep-resentative of the total number of sales to related parties. NTN claims that Commerce never considered the number of models sold to related and unrelated parties as a relevant factor in its decision. *Id.* at 31.

Commerce responds that 19 U.S.C. § 1677b, which defines FMV, does not address when Commerce may use related party prices in calculating FMV. *Commerce's Brief* at 60 (citing *Smith–Corona Group v. United States,* 713 F.2d 1568, 1571 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)). Commerce also contends that whether sales are comparable must be demonstrated to its satisfaction. *Id.* at 60–61 (citing 19 C.F.R. § 353.45(a)). In addition, Commerce argues that it has broad discretion to devise an appropriate methodology to determine whether a particular related party's prices are, in fact, comparable to unrelated party prices. *Id.* at 61. Commerce also defends its comparison of sales of only identical models as consistent with its regular practice. Commerce asserts that comparison of non-identical models could easily introduce distortions into the process. *Id.* at 64–65.

In calculating FMV, Commerce normally excludes sales to related parties unless the sales were made at arm's length, *i.e.,* unless the prices of those sales are "comparable" to the prices of sales made to unrelated parties. *See* 19 C.F.R. § 353.45(a).

Responding to NTN, Commerce revised the arm's-length test in an attempt to accurately reflect whether NTN's related party sales were made at arm's length. *See* Final Results Memo. Applying the arm's-length test, Commerce found that related party prices for sales of ball and cylindrical roller bearings were lower than unrelated party prices. *Id.* at 7. Commerce excluded those sales. Similarly, Commerce included NTN's related party sales of spherical roller bearings because related party prices for those bearings exceeded prices to unrelated parties. *Id.*

The Court disagrees with NTN that Commerce's arms-length test is flawed because Commerce did not take into account certain factors proposed by NTN. Even assuming,

*arguendo,* that NTN's proposed factors are relevant to Commerce's determination, consideration of these factors would be speculative as NTN's narrative response to Commerce's related party inquiry was limited to the statement "[c]ode '1' is used for sales to unrelated customers and code '2' for related customers." Japan C.R. Document No. 50, Fiche 257–58, Frame 32 at 6. NTN provided no other information. A respondent must demonstrate that the related party price in question is an arm's-length price. *See Creswell Trading Co. v. United States,* 15 F.3d 1054 (Fed.Cir.1994). In this case, NTN failed to demonstrate that its sales to related parties were at arm's length.

■ Moreover, under the applicable statute and regulation, Commerce enjoys considerable discretion in deciding whether to include related party sales when calculating FMV. *Usinor Sacilor v. United States,* 18 CIT ——, ——, 872 F.Supp. 1000, 1004 (1994). The statute merely provides that the prices of sales to a related party "may be used in determining the foreign market value." 19 U.S.C. § 1677b(a)(3). In addition, Commerce's implementing regulation provides that:

> [i]f a producer or reseller sold such or similar merchandise to a person related as described in section 771(13) of the Act, the Secretary ordinarily will calculate foreign market value based on that sale *only if satisfied* that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller.

19 C.F.R. § 353.45(a) (emphasis added).

The Court will uphold the test that Commerce selects to measure whether sales to related parties were made at arm's-length prices unless that test is shown to be unreasonable. *See Micron Technology, Inc. v. United States,* 19 CIT ——, ——, 893 F.Supp. 21, 37–38 (1995). *See also Usinor Sacilor,* 18 CIT at ——, 872 F.Supp. at 1004. Upon review, the Court finds that NTN has not demonstrated any record evidence tending to show that, in application, Commerce's test was unreasonable. *Cf. Micron Technology,* 19 CIT at ——, 893 F.Supp. at 38 (upholding Commerce's arm's-length test giv-

en respondent's failure to show that sales to its related customers were made at arm's-length prices); *Usinor Sacilor,* 18 CIT at ——, 872 F.Supp. at 1004 (upholding Commerce's arm's-length test as reasonable given the lack of evidence showing a distortion of price comparability).

Hence, as NTN failed to satisfy it's burden of proving that its sales to related parties were at arm's length, the Court upholds Commerce's arm's-length test used to evaluate NTN's related party sales as reasonable, in accordance with law and supported by substantial evidence.

11. *Use of 4.1 Roller Length-to-Diameter Ratio to Distinguish Cylindrical and Needle Roller Bearings*

■ In this review, Commerce included roller bearings with a roller length-to-diameter ratio between 3:1 and 4:1 in its cylindrical roller bearing margin calculations. NTN objects to their inclusion, claiming that the use of the 4:1 ratio is in direct conflict with the recognized definitions of needle and cylindrical roller bearings. *NTN's Brief* at 31–36. NTN requests that the Court reconsider whether needle roller bearings with a roller length-to-diameter ratio of between 3:1 to 4:1 are correctly within the scope of the order. *Id.* at 36.

The Court has previously ruled on this issue and sustained Commerce's classification of such bearings as cylindrical roller bearings within the scope of the relevant antidumping duty order on antifriction bearings from Japan. *See Koyo Seiko Co. v. United States,* 17 CIT 1076, 834 F.Supp. 1401 (1993), *aff'd per curiam,* 31 F.3d 1177 (Fed.Cir.1994). The Court of Appeals for the Federal Circuit affirmed this Court's determination in a *per curiam* decision dated July 18, 1994.

Accordingly, this Court upholds Commerce's classification of roller bearings with a roller length-to-diameter ratio between 3:1 and 4:1 as cylindrical roller bearings.

### CONCLUSION

The Court finds that, in every case, NTN's challenges are unavailing. Therefore, in accordance with the foregoing opinion, the

Court finds that Commerce's actions are supported by substantial evidence and in accordance with law. For the reasons stated above, NTN's motion for judgment upon the agency record is denied in all respects and the Final Results are affirmed. This case is hereby dismissed.