NTN BEARING CORP. OF AMERICA,
American NTN Bearing Mfg. Corp.
and NTN Corporation, Plaintiffs,

v.

UNITED STATES, Defendant,

The Timken Company, Defendant–
Intervenor.

Court No. 91–09–00695.

United States Court of
International Trade.

Oct. 22, 1993.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger and Jesse M. Gerson, Chicago, IL, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: Joan L. MacKenzie and Linda S. Chang, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Patrick J. McDonough and Julie Chasen Ross, Washington, DC, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corporation ("NTN"), move pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record. Plaintiffs specifically claim that the Department of Commerce, International Trade Administration ("Commerce" or "ITA"), erred in (1) failing to employ a 10% maximum deviation limit on any single physical criterion employed by the ITA in its "sum of the deviations" methodology used to determine similar merchandise sold in the home market; (2) basing foreign market value of tapered roller bearing cups and cones sold in the United States upon prices created by splitting the price of complete bearings sold in the home market; (3) crossing over to other levels of trade in calculating foreign market value for purposes of identifying sales of such or similar merchandise; (4) refusing to make a level of trade adjustment; (5) refusing to use a period of nine months as part of its test to exclude home market sales made at prices below the cost of production; (6) not using the interest rate supplied by NTN for purposes of calculating credit expenses in Japan and inventory carrying cost in the U.S.; and (7) failing to make an adjustment to home market price for NTN's home market packing expenses.

The administrative determination under review is the ITA's final results in *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 56 Fed.Reg. 41,-508 (1991).

### Background

On March 8, 1989, Commerce initiated an administrative review of tapered roller bearings ("TRBs") covering the period March 27, 1987 through September 30, 1988. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 54 Fed.Reg. 9,868 (1989).

In April of 1991 Commerce published its preliminary determination in the administrative review. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From Japan; Preliminary Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 13,618 (1991).

On August 21, 1991, Commerce published its Final Results in this proceeding. *Final Results*, 56 Fed.Reg. at 41,508.

*Discussion*

■ In reviewing a final determination of Commerce, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir. 1990).

1. *Ten Percent Deviation Cap*

■ In this review, the model match methodology selected by Commerce first sought to match identical models sold in the home market and if none were found, the most similar model was selected based on the sum of the deviations methodology. In this methodology, Commerce evaluated five physical characteristics (inside diameter, outside diameter, width, load rating and the Y factor), in conjunction with a 20% variable cost of manufacture difference used as an eliminating factor or "cap." Administrative Record ("AR") (Pub.) Doc. 228 at 2. NTN claims that Commerce's refusal to employ an additional 10% maximum deviation cap on any single physical criterion employed by Commerce in its "sum of the deviations" methodology is unsupported by substantial evidence on the record and not in accordance with law. *Plaintiffs' Motion and Memorandum in Support Thereof for Judgment on the Agency Record ("Plaintiffs' Motion")* at 10.

NTN claims that Commerce's model match methodology resulted in comparisons of commercially dissimilar U.S. and home market products contrary to the requirements of the antidumping law. NTN states that in its final results Commerce should have remained with the methodology it used in the original investigation.

In its original investigation of TRBs, Commerce implemented the 10% cap noting as follows:

> We ... chose our selections by taking the U.S. bearing and comparing it to all bearings in the home market *in which each individual criterion deviation is 10 percent or less....* This methodology relies on the physical properties of the bearings and would give interested parties a predictable basis for determining possible product matches in annual reviews under section 751 of the Act if such reviews are conducted in the future.

*Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 30,700, 30,703 (1987) (emphasis added).

Commerce claims that the 10% cap is not necessary as it would eliminate from use as comparison models home market sales which overall are most similar to the U.S. TRBs. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record* at 20.

This Court recently ruled on this issue in *Koyo Seiko Co. v. United States,* 17 CIT ——, ———–——, 834 F.Supp. 431, 434–35 (1993) stating that Commerce's methodology

> must be used in conjunction with the ten percent cap to limit the permissible deviation of the criteria used to make TRB models. Commerce used the cap in its original less than fair value determination and its use avoids comparisons between products which differ so dramatically that they simply cannot be considered commercially similar.

*Id.* at ——, 834 F.Supp. at 435.

The Court adheres to its earlier decision and, therefore, this case is remanded to Commerce to apply the 10% cap to the methodology used in the final results.

### 2. Split Sales

■ NTN secondly claims that Commerce erred in basing foreign market value ("FMV") of tapered roller bearing cups and cones sold in the United States upon prices created by splitting the price of complete bearings sold in the home market. *Plaintiffs' Motion* at 14. In its final determination, Commerce "split" sales of TRB sets in the home market into "sales" of individual cups and cones for purposes of establishing the foreign market value of cups and cones sold in the United States. *Final Results*, 56 Fed.Reg. at 41,511. NTN now claims that such splitting of sets is contrary to the statute in that it results in the use of fictitious sales and fictitious markets for purposes of establishing foreign market value. *Plaintiffs' Motion* at 14–15. According to 19 U.S.C. § 1677b(a)(1) (1988):

> In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

In the present case, Commerce explained that FMV could be determined upon the basis of home market prices of sets by apportioning the price of a set to its component parts. Commerce stated:

> Our set-splitting methodology is used to apportion the price of a set to its component parts based on a ratio of the cost of production of each part to the cost of production of the set. Set splitting was specifically upheld by the CIT [citation omitted]. At no time do we create a fictitious sale; we allot portions of the price of actual sales to their component parts.

*Final Results*, 56 Fed.Reg. at 41,511.

Plaintiffs' contention that the splitting of sets frustrates the antidumping law because it divests the exporter of control over its home market prices is without merit. If plaintiffs' interpretation of the statute were followed, "such interpretation would encourage importers to circumvent the antidumping laws by simply using divergent invoicing methods." *See NTN Bearing Corp. of America v. United States*, 14 CIT 623, 640, 747 F.Supp. 726, 741 (1990); *see also*, *Timken Co. v. United States*, 11 CIT 786, 794–95, 673 F.Supp. 495, 504–05 (1987).

These same issues were presented in *NTN Bearing Corp.*, 14 CIT 623, 747 F.Supp. 726, as well as in *Timken Co.*, 11 CIT 786, 673 F.Supp. 495, where this Court upheld Commerce's calculation of FMV for individual cups and cones by splitting the home market price for a set. The case at hand is similar and, therefore, the Court adheres to its earlier decisions and Commerce's use of the "splitting" methodology to calculate FMV is hereby affirmed.

### 3. Levels of Trade

■ NTN also contests Commerce's comparison of U.S. and home market sales across different levels of trade. *Plaintiffs' Motion* at 28. During the review, Commerce first searched for such or similar merchandise at the same level of trade and, if none could be found, then at different levels of trade. NTN claims that Commerce's comparison of U.S. and home market sales "across different levels of trade" is not supported by substantial evidence and is contrary to law.

This Court on several occasions has affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. *See Koyo Seiko Co.*, 17 CIT at ——, 834 F.Supp. at ——; *Koyo Seiko Co. v. United States*, 17 CIT ——, 810 F.Supp. 1287 (1993); *Timken Co. v. United States*, 10 CIT 86, 630 F.Supp. 1327 (1986); *NTN Bearing Corp.*, 14 CIT 623, 747 F.Supp. 726; *Timken Co.*, 11 CIT 786, 673 F.Supp. 495; *Koyo Seiko Co. v. United States*, 16 CIT ——, 796 F.Supp. 1526 (1992).

This Court refused to recognize a "level of trade" argument similar to NTN's in *NTN Bearing Corp.*, 14 CIT at 634, 747 F.Supp. at 736, stating:

> With respect to plaintiffs' contention that the ITA's disregard of levels of trade differences is contrary to law, plaintiffs have not provided, nor has the court uncovered any support for this argument. To the contrary, this court has noted previously that there is no statutory mandate requiring Commerce to remain within the

same levels of trade while effecting its "such or similar merchandise" determination.

In this case, plaintiffs similarly have no basis for requesting that the Court require Commerce to limit its comparisons by the level of trade in which the sales occur.

Thus, the Court adheres to its earlier decisions and, therefore, Commerce's comparison of sales across different levels of trade was in accordance with law.

### 4. Level of Trade Adjustment

■ NTN alternatively claims that if Commerce were to cross trade levels when selecting such or similar merchandise, Commerce should make an appropriate adjustment for differences in the two trade levels pursuant to 19 C.F.R. § 353.58 (1991), which states:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and *make appropriate adjustments for differences affecting price comparability.*

(Emphasis added).

Accordingly, NTN now asks the Court to remand this case to Commerce with instructions to explain why NTN's request for a level of trade adjustment based on price is inadequate and also to consider a level of trade adjustment based on differences in price rather than expense alone. *Plaintiffs' Motion* at 35–36.

In the present case, however, Commerce explained to the satisfaction of this Court its rejection of NTN's claim for a level of trade adjustment based on price:

> NTN's contention that a level of trade adjustment should be based on the measurable difference in prices across levels does not address the issue of whether the difference in price is due purely to the difference in level of trade, or whether any

other factors are affecting the difference in price. The only quantifiable information submitted by NTN that accounts for the difference in prices across levels of trade are selling expenses. Because we already make adjustments for direct selling expenses, it would be double counting to deduct them again in the context of a level of trade adjustment. Therefore, where comparison sales in the home market were insufficient at the same level of trade as the U.S. sale, we crossed levels of trade in search of such or similar merchandise, and allowed a level of trade adjustment to FMV based only on the difference in indirect selling expenses between levels of trade for NTN.

*Final Results,* 56 Fed.Reg. at 41,512.

Thus, Commerce concluded that the only quantifiable information submitted by plaintiffs that accounts for the difference in price across levels of trade is selling expenses and since direct selling expenses were already deducted, Commerce found that a deduction of indirect selling expenses was the only basis for a level of trade adjustment. *Id.* The Court agrees and finds that Commerce acted reasonably and hereby affirms its decision on this issue.

### 5. Below Cost Sales

■ NTN also claims that Commerce erred in using a period of three months to determine whether sales were made below cost over an extended period of time. *Plaintiffs' Motion* at 45. NTN asserts that three months is not an extended period of time and claims that Commerce should have used a period of nine months as part of its test to exclude home market sales made at prices below the cost of production from price comparisons to sales in the U.S. *Id.*

According to 19 U.S.C. § 1677b(b) (1988):

> Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine

whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—

(1) have been made over an *extended period of time* and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,

such sales shall be disregarded in the determination of foreign market value.

(Emphasis added).

Plaintiffs claim that an "extended period of time" means an "amount of time that represents at least the majority of the period." *Plaintiffs' Motion* at 45. To support this contention, however, plaintiffs merely consulted a dictionary defining "extended" as "covering a great extent of time." *Id.* at 45–46.

In its final results, Commerce rejected this proposition claiming that 19 U.S.C. § 1677b(b)

is designed to ensure that below-cost sales are not disregarded if these sales occurred over a short period of time or resulted from normal business practices, such as selling obsolete or end-of-year merchandise at below-cost prices. TRBs are a commodity item that do not demonstrate perishability, seasonality, or frequent generational changes in models. No information on the record in this case indicates that below-cost sales are a normal practice or characteristic in the industry. We used the period of three months to define an extended period of time since three months is commonly used to measure corporate, financial and economic performance. Use of three months to measure frequency of below-cost sales shows that sales below the cost of production are not random, accidental or sporadic. This time measurement also ensures that the Department uses home market prices that are above the cost of production in its price-to-price comparisons in all but random or sporadic situations.

Therefore, we have determined below-cost sales occurring in three or more months of the review period to have been made over an extended period of time. *Final Results,* 56 Fed.Reg. at 41,516.

Furthermore, Commerce indicates that 19 U.S.C. § 1677b(b) is silent as to what constitutes an "extended period of time" within the meaning of the statute. Considering this and Commerce's complete explanation on the record, this Court agrees with Commerce on this issue and rules that it acted reasonably and in accordance with law. Therefore, Commerce's determination as to this issue is hereby affirmed.

### 6. *Credit Expenses*

■ Plaintiffs also claim that Commerce erred by not using the interest rate supplied by NTN for purposes of calculating credit expenses in Japan and inventory carrying cost in the U.S. NTN claims that compensating deposits were a factor affecting the net credit cost reported. *Plaintiffs' Motion* at 47. Compensating deposits or balances "are bank deposits held as security for outstanding loans. Many banks require a borrower to maintain an average account balance equal to a percentage of the outstanding loan, which effectively raises the real interest rate on the loan." *See Timken Co. v. United States,* 16 CIT ——, ——, 809 F.Supp. 121, 124 (1992); *see also, PPG Indus., Inc. v. United States,* 14 CIT 522, 526 n. 8, 746 F.Supp. 119, 124 n. 8 (1990).

In *Timken Co.,* 16 CIT at ——, 809 F.Supp. at 124, Commerce found the deposit of compensating balances a requirement of NSK's loan agreements and, therefore, granted a corresponding adjustment in the home market credit costs necessary for maintenance of a credit line. The Court in that case found that the evidence on the record failed to clearly show whether funds deposited with NSK's bank were deposited as a prerequisite for obtaining loans and the Court remanded the case to Commerce to substantiate whether the amounts deposited by NSK were in fulfillment of the bank's requirement. *Id.*

In this case, Commerce conversely has not justified why it should not consider plaintiffs'

information on credit costs. In its Final Results, Commerce merely states that

> there is inadequate justification to accept NTN's credit cost calculation based on compensating deposits. In our preliminary results we recalculated NTN's credit costs based on the firm's net interest expense ... as most representative of the firm's internal cost of funds.

*Final Results,* 56 Fed.Reg. at 41,513.

Therefore, this case is remanded to Commerce to either recalculate NTN's credit expenses and inventory carrying costs to take into account plaintiffs' information on compensating balances or, in the alternative, to substantiate on the record why it should not.

### 7. *Home Market Packing Expenses*

■ Finally, plaintiffs claim that Commerce erred in failing to make an adjustment to home market price for NTN's home market packing expenses. Commerce stated at the administrative level that NTN's adjustment for home market packing costs should be rejected because respondent did not supply adequate information on these costs. *Final Results,* 56 Fed.Reg. at 41,512.

On August 6, 1990, in its supplemental questionnaire response NTN supplied Commerce with cost information relating to packing expenses incurred by one cost center. AR (Pub.) Doc. 95. NTN stated:

> Packing expense is incurred at several of the cost centers listed on Exhibit B–2. It would be unduly burdensome for NTN to submit detailed accounting breakdown for each of the cost centers. Instead, NTN is supplying as Appendix 4 a sample of the packing expenses incurred for one of the cost centers.

*Id.* at 8. NTN further stated that "[s]imilar information can be provided at the time of the verification if the ITA feels that such data is of any use." *Id.*

NTN now claims that since Commerce decided not to verify and did not request any additional information regarding packing ex-

penses, then Commerce was satisfied with NTN's response. *Plaintiffs' Motion* at 51.

Commerce, on the other hand, argues that even if it chose to verify, verification would have been too late for NTN to supply any missing data pursuant to 19 C.F.R. § 353.31 (1991) which states in pertinent part:

§ 353.31 **Submission of factual information.**

(a) *Time limits in general.* (1) Except as provided in paragraphs (a)(2) and (b) of this section, submissions of factual information for the Secretary's consideration shall be submitted not later than:

(i) For the Secretary's final determination, seven days before the scheduled date on which the verification is to commence;

(ii) For the Secretary's final results of an administrative review under § 353.22(c) or (f), the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review; or

. . . .

(2) Any interested party ... may submit factual information to rebut, clarify, or correct factual information submitted by an interested party. ... at any time prior to the deadline provided in this section for submission of such factual information or, if later, 10 days after the date such factual information is served on the interested party. . . .

(3) The Secretary will not consider in the final determination or the final results, or retain in the record of the proceeding, any factual information submitted after the applicable time limit.

Furthermore, it is the respondent who bears the burden of establishing that it is entitled to an adjustment by supplying the agency with adequate information upon which to base its decision. *See* 19 C.F.R. § 353.54;[1] *NSK Ltd. v. United States,* 17 CIT ——, ——, 825 F.Supp. 315, 321 (1993); *Koyo Seiko Co.,* 16 CIT at ——, 796 F.Supp. at 1530; *Timken Co.,* 11 CIT at 804, 673 F.Supp. at 513. It is not Commerce's job to

---

1. "Any interested party that claims an adjustment ... must establish the claim to the satisfac-

tion of the Secretary." 19 C.F.R. § 353.54.

plead with a respondent to submit detailed information. Therefore, this Court holds that Commerce acted reasonably in not making an adjustment to home market price for NTN's packing expenses.

### Conclusion

In accordance with the foregoing opinion, plaintiffs' motion for judgment on the agency record is granted in part and this case is remanded to Commerce to (1) apply the 10% cap to the methodology used in the final results, and (2) either recalculate NTN's credit expenses and inventory carrying cost to take into account the effect of compensating balances or, in the alternative, to substantiate on the record why it should not. Remand results are due within thirty (30) days of the date this opinion is entered. Comments to remand results are due fifteen (15) days after the date the remand results are issued, and responses to the comments are due within fifteen (15) days thereafter. Plaintiffs' motion is denied in all other respects.