**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A.,**
Plaintiffs,

v.

**UNITED STATES and the United States Department of Commerce,**
Defendants,

**The Timken Company, Defendant–Intervenor.**

Slip Op. 96–122.
Court No. 94–12–00779.

United States Court of
International Trade.

Aug. 5, 1996.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Niall P. Meagher, Elizabeth C. Hafner and Lee Ann Alexander), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: David W. Richardson, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendants.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and William A. Fennell), Washington, DC, for defendant-intervenor.

### OPINION

TSOUCALAS, Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final determination of administrative reviews entitled *Tapered Roller Bearings, Four Inches or Less in Diameter, and Components Thereof, From Japan ("Final Results")*, 59 Fed.Reg. 56,035 (1994).

### Background

In 1980, Commerce began administering the antidumping law and initiated a number of administrative reviews covering outstanding antidumping determinations, including the finding on tapered roller bearings ("TRBs") from Japan issued on August 18, 1976. *See Tapered Roller Bearings and Certain Components From Japan*, 41 Fed.Reg. 34,974 (1976). The initiated reviews covered the period of 1980 through 1985.

In 1986, when the antidumping statute was amended to provide administrative reviews by request only, Commerce re-initiated incomplete reviews based on requests from interested parties. On July 9, 1986, Commerce re-initiated the reviews of Koyo's entries for the period of 1974 through 1985. *See Initiation of Antidumping Duty Administrative Reviews*, 51 Fed.Reg. 24,883 (1986). In 1989, in an attempt to dispose of a backlog of incomplete reviews of TRBs, Commerce divided the administrative proceedings for Koyo into two parts—one covering the 1974 through March, 1979 review periods, and the other covering the April, 1979 through July, 1985 review periods (later expanded to include the 1985–86 review periods).

On June 1, 1990, Commerce published the final results for the 1974 through March, 1979 review periods for Koyo. *See Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,369 (1990).

On May 13, 1991 Koyo resubmitted its data for the 1979–86 review periods to conform with Commerce's current computer format. P.R.Doc. No. 719, Fiche 16, Frame 1. On September 17, 1993, Commerce issued a supplemental questionnaire. P.R.Doc. No. 790, Fiche 41, Frames 66–71. Koyo responded to the supplemental questionnaire on November 1, 1993. P.R.Doc. No. 799, Fiche 42, Frame 1. Commerce published the final results for these reviews on November 24, 1994. *See Final Results,* 59 Fed.Reg. at 56,035.

Koyo brought this action pursuant to Rule 56.2 of the Rules of this Court for judgment upon the agency record claiming that the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) applying best information available ("BIA") to sample sales; (2) applying BIA to discounts and allowances; and (3) comparing components split from home market tapered roller bearing sets to cups and cones sold individually in the U.S. market.[1] On January 18, 1993, this Court granted Koyo's consent application for a preliminary injunction suspending liquidation of entries of TRBs involved in the reviews at issue during the pendency of this litigation.

## Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Application of BIA to Sample Sales*

In the Final Results at issue, Commerce resorted to BIA to determine the value of Koyo's U.S. sample sales. 59 Fed.Reg. at 56,049. Commerce explained its choice of BIA as follows:

> We only have information on Koyo's home market sample sales. Therefore, we used the data for home market sample sales from the 1985/86 period. We used the relationship of home market sample sales to total home market sales to represent the relationship of U.S. sample sales to total U.S. sales. With this information, we determined a value for those U.S. sample sales and applied a BIA margin to that value. We added both the resulting duties due amount and the calculated value of the sample U.S. sales to our respective margin and value totals in deriving our weighted-average margin.

59 Fed.Reg. at 56,049–50.

Koyo argues that Commerce's decision to apply BIA and its choice of BIA constituted an abuse of discretion. According to Koyo, it was unable to supply the information requested because Commerce did not request data regarding U.S. sample sales until September 17, 1993 which was fourteen years after the beginning of the first period of these reviews, and six years after the end of the final period. Koyo claims that it was unable to identify its U.S. sample sales after such a long period of time had passed since its original submission. Koyo explains that in order to comply with Commerce's request,

---

**1.** Plaintiffs abandoned three of the original six counts of their complaint. *See* Pls.'

Mem.Supp.Mot.J.Agency R. at 1; Pls.' Reply to Opp'n to Pls.' Mot.J.Agency R. at 2.

it would have had to review manually all of its old U.S. invoices for the 1979–86 period which numbered in the tens of thousands. Pls.' Mem.Supp.Mot.J.Agency R. at 13–14.

Koyo further emphasizes that it was Commerce's failure to proceed with its investigation in a timely manner that resulted in Koyo's inability to provide the requested data. Relying on *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 387, 795 F.Supp. 417, 421 (1992), Koyo maintains that Commerce improperly held Koyo responsible for Commerce's tardiness and repeated changes of methodology. Pls.' Mem.Supp.Mot.J.Agency R. at 16–17.

Commerce responds that Koyo, as an experienced importer/exporter, has been on notice since 1981 that Commerce regards U.S. sample sales as covered by a dumping finding and that Commerce had a policy of treating sample sales in the same manner as other U.S. sales. Defs.' Opp'n to Pls.' Mot.J.Agency R. at 8–10. Commerce emphasizes that Koyo's failure to submit the requested data in its supplemental questionnaire response was a result of Koyo not wanting to review manually all of its sales invoices as opposed to Koyo not having the information. Defs.' Opp'n to Pls.' Mot.J.Agency R. at 10–11.

Commerce also defends its choice of BIA arguing that under the circumstances, in which Koyo submitted no information regarding its U.S. sample sales, Commerce properly assumed that the relationship between Koyo's home market sample sales from the 1985–86 period of review to total home market sales represented the relationship of U.S. sample sales to total U.S. sales. If this were not a reasonable assumption, Commerce asserts that Koyo would have provided Commerce with data on its U.S. sample sales. In addition, Commerce suggests that it could have assigned to the missing U.S. sample sales a zero price which would have resulted in a more adverse dumping margin. *Id.* at 11–13 (citing *J.C. Hallman Mfg. Co. v. United States*, 13 CIT 1073, 1076, 728 F.Supp. 751, 753 (1989)).

Defendant-intervenor The Timken Company ("Timken") supports Commerce's position on this issue arguing that Koyo failed to demonstrate that business records regarding

U.S. sample sales did not exist or could not be reviewed within the time allowed. Timken contends that the fact that Koyo had the ability to review manually a large quantity of other sales data supports the conclusion that Koyo could have segregated sample sales in the course of its sales data review. According to Timken, Koyo's response to Commerce's request for information was tailored to exclude U.S. sales from the margin analysis. Def.–Int.'s Opp'n to Pls.' Mot.J.Agency R. at 12–14. Timken also agrees with Commerce's choice of BIA arguing that it was reasonable in light of Koyo's refusal to submit requested data. *Id.* at 15–16.

Section 1677e(c) of Title 19, United States Code (1988), states that Commerce "shall, *whenever a party* or any other person refuses *or is unable to produce information requested in a timely manner and in the form required,* or otherwise significantly impedes an investigation, use the best information otherwise available." (Emphasis added). In addition, Commerce's regulations instruct the Secretary to use BIA whenever Commerce:

> (1) *Does not receive a complete, accurate, and timely response to the Secretary's request for factual information;* or

> (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1993) (emphasis added).

Courts have clearly acknowledged that the statute does not specifically restrict Commerce's ability to resort to BIA to situations in which the respondent is "able" to provide the requested information. *See Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1574 (1990) (holding that section 1677e(b) requires noncompliance with an information request before use of BIA is appropriate "whether due to refusal or mere inability"); *see also Koyo Seiko Co. v. United States*, 19 CIT ——, ——, 905 F.Supp. 1112, 1116–17 (1995) (holding that Koyo's inability to produce information in the possession of an uncooperative related party justified Commerce's resort to BIA). The language of the statute clearly directs Commerce to use BIA

if the respondent "refuses or is unable" to respond to a request for information. Similarly, the regulations direct Commerce to use BIA whenever it does not receive "complete" and "accurate" information. 19 C.F.R. § 353.37(a)(1).

There is no question that Koyo failed to provide Commerce with requested information. Koyo acknowledged its own failure to report the requested sample sales in its response to the supplemental questionnaire by stating the following:

> Koyo's previous submissions of sales data in this reviews [sic] did not include sample sales. The Department's methodology regarding sample sales has evolved considerably since this review began in 1979. In the early stages of this review, the Department's questionnaires issued to Koyo did not require the reporting of sample sales. Moreover, the Department has excluded sample sales from Koyo's margin analysis in TRB reviews covering periods subsequent to those under consideration in this review. Accordingly, Koyo did not report sample sales in this review.
>
> In accordance with the Department's request, Koyo has prepared a listing of home market sample sales during the periods covered by these reviews. . . .
>
> Because of the manner in which [Koyo] maintained its sales records during these periods of review, [Koyo] is unable to prepare a listing of U.S. sample sales for these periods. To produce such a listing, [Koyo] would have to review manually all of its sales invoices and records for the covered periods. Koyo has not been able to undertake this task in time to respond to this questionnaire, and thus cannot provide a listing of U.S. sample sales.

P.R.Doc. No. 799, Fiche 42, Frames 11–12.

Koyo's reliance on *Shikoku*, 16 CIT at 387, 795 F.Supp. at 421 to support its position is misplaced. In *Shikoku*, the court held that Commerce acted beyond its discretionary powers by changing its methodology for the fifth and sixth antidumping administrative reviews after using a different methodology for the first four, even though the new methodology was likely to be a slight improvement. 16 CIT at 388, 795 F.Supp. at 422.

The court noted that "[a]t some point, Commerce must be bound by its prior actions so that parties have a chance to purge themselves of antidumping liabilities." *Id.* at 387, 795 F.Supp. at 421.

The facts of the present case are distinguishable from those of *Shikoku*. First of all, *Shikoku* involved a change in Commerce's method of allocation as opposed to the application of BIA. Second, the respondents in the reviews involved in *Shikoku* claimed that they relied on Commerce's prior methodology in preparing their responses to Commerce's requests for information. There was no evidence in *Shikoku* that the respondents had not provided Commerce with requested information. In the case at bar, Koyo specifically declined to respond to Commerce's supplemental questionnaire request for information regarding sample sales. Unlike *Shikoku*, this is not a situation in which a respondent provided Commerce with all of the requested information and Commerce suddenly changed its methodology.

■ Assuming Koyo's failure to report sample sales was in fact due to the impossibility of reviewing manually all of its U.S. sales at such a late point in the investigations, Koyo's inability to provide the information justified Commerce's use of BIA. The statute, accompanying regulation and case law compel this result. The next issue is whether Commerce's choice of BIA was appropriate considering the circumstance surrounding Koyo's inability to provide the sample sales data.

In *Allied–Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed.Cir.1993), the CAFC noted that "because Congress has 'explicitly left a gap for the agency to fill' in determining what constitutes the best information available, the ITA's construction of the statute must be accorded considerable deference" (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Furthermore, Commerce has interpreted BIA as a rule of adverse inference which establishes a presumption that the highest prior margins are the best information available. *Rhone Poulenc,*

*Inc. v. United States,* 899 F.2d 1185, 1190–91 (Fed.Cir.1990). In *Rhone Poulenc,* the Court of Appeals for the Federal Circuit ("CAFC") upheld Commerce's use of the highest prior margin as BIA stating the following:

> [I]t reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less. The agency's approach fairly places the burden of production on the importer, which has in its possession the information capable of rebutting the agency's inference.

899 F.2d at 1190.

█ In this case, Commerce selected the highest margin for any of the review periods at issue (1985–86 review period) and used the relationship between total home market sales and home market sample sales to determine the relationship between total U.S. sales and U.S. sample sales. The Court finds that this selection of BIA was not punitive and constituted a reasonable application of BIA. Presuming Koyo knew that BIA is a rule of adverse inference, it could have made some attempt to review manually the information necessary to rebut Commerce's presumption. Koyo was able to review a significant portion of other sales manually to conform to Commerce's new reporting requirements as demonstrated by the letter dated November 5, 1990, in which Koyo requested the opportunity to resubmit data to Commerce on computer tape which required key-punching. P.R.Doc. No. 711, Fiche 15, Frames 25–26. Koyo submitted the revised data on May 13, 1991 which was twelve years after the first period of these reviews, and four years after the end of the final period. *See* P.R.Doc. No. 719, Fiche 16, Frame 1. These submissions severely undermine Koyo's arguments concerning its alleged inability to review data manually at such a late point during the administrative reviews. The Court also notes that Commerce's choice of BIA was not completely adverse thereby taking into account Commerce's responsibility for the numerous delays in completing the reviews.

Commerce used the ratio of total home market sales to home market sample sales rather than the highest ratio of total home market sales to home market sample sales. Accordingly, the Court concludes that Commerce's selection of BIA was supported by substantial evidence on the agency record and in accordance with law.

### 2. *Use of BIA to Compute Discounts*

In the Final Results Commerce resorted to BIA to compute Koyo's U.S. discounts because Koyo did not report the discounts on a transaction-specific basis. Commerce assigned as BIA "the highest percentage discount reported for any U.S. sale to all sales that received a discount during each POR [period of review]." 59 Fed.Reg. at 56,044.

Koyo contests the use of BIA for its U.S. discounts claiming that it was not Commerce's practice during the review periods to require Koyo to allocate discounts on a transaction-specific basis. Koyo maintains that until recently, Commerce had consistently accepted customer-specific discount factors in TRBs and anti-friction bearings reviews. Koyo claims that it had no notice of Commerce's new practice of accepting only transaction-specific discount reporting until it received the supplemental questionnaire on September 17, 1993. Koyo insists that it could not report transaction-specific discounts because of the *manner in which* it had maintained its records during the 1979–86 review periods. According to Koyo, the use of BIA punished Koyo for Commerce's own excessive delays in completing the reviews. Pls.' Mem.Supp.Mot.J.Agency R. at 18–23.

Koyo further maintains that even if the application of some form of BIA was appropriate, Commerce should not have used such adverse BIA. Koyo contends that neutral BIA would have been more appropriate in light of Commerce's failure to complete these reviews in a timely manner. Pls.' Mem.Supp.Mot.J.Agency R. at 23–24.

In response, Commerce argues that it properly resorted to BIA after Koyo failed to respond adequately to an information request. Commerce asserts that it gave Koyo the choice to report discounts on a transaction-specific or customer-specific basis and

Koyo did not comply with either option. Commerce explains that Koyo provided Commerce with average discount rates for the review periods in question. Commerce further contends that accuracy in calculating the proper dumping margins demanded that discounts be reported on a specific basis. Defs.' Opp'n to Pls.' Mot.J.Agency R. at 14–18.

Commerce also defends its choice of BIA emphasizing that Koyo did not report accurate discount information and, therefore, Commerce did not reject low margin information in favor of high margin information that was demonstrably less probative of current conditions. Commerce also insists that the highest discount figures used by Commerce were very close to the figures supplied by Koyo. *Id.* at 18–19.

Defendant-intervenor Timken supports Commerce's position on this issue. Def.–Int.'s Opp'n to Pls.' Mot.J.Agency R. at 19–24.

On May 13, 1991, Koyo submitted revised data explaining its method of reporting discounts as follows:

> Koyo calculated adjustments for discounts based upon its income statements for each year of the POR because the discount programs always applied to a variety of products, including but not limited to the subject merchandise. For this POR, [Koyo] does not have computerized customer-by-customer data for either discounts or allowances. Therefore, Koyo calculated a combined discount and allowance factor for each year because these expenses are reported as one expense on [Koyo's] income statements. The combined discount/allowance factor was calculated by dividing the total discounts and allowances actually granted during the review period by the total value of sales during that review period. This factor was then multiplied by the per-unit sales price for each sale to derive the expense that is reported on the computer tape.

P.R.Doc. No. 719, Fiche 16, at C–9. In the supplemental questionnaire dated September 17, 1993, Commerce requested Koyo to "provide documentation of the discount rates in effect during each of the review periods and report this item on a transaction-specific ba-

sis" and "[i]f this is not possible, provide customer-specific discount rates." P.R.Doc. No. 790, Fiche 41, Frame 70. In its submission on November 1, 1993, Koyo responded to this request as follows:

> Because of the manner in which it maintained its sales records during the periods covered by this review, [Koyo] does not have the data necessary to report its discounts either on a transaction-specific basis or on a customer-specific basis.
>
> [Koyo] reported its discounts based on an allocation of its total discounts from its financial statements over its total sales for each period. While [Koyo] now maintains a computer record of the discount rates in effect from time to time for each customer, [Koyo] did not maintain any such records during the 1979/86 period. Accordingly, [Koyo] does not have a complete listing of discount rates for AM customers for the 1979/86 period.

P.R.Doc. No. 799, Fiche 42, Frames 23–24.

■ Once again, Koyo failed to provide Commerce with information in the manner requested. Commerce requested that the discounts be reported on either a transaction- or customer-specific basis. The application of BIA is appropriate when a respondent does not provide information "in the form required." 19 U.S.C. § 1677e(c). Koyo clearly failed to report its U.S. discounts in the form required by Commerce.

Further, in a previous case involving Koyo, this Court rejected an argument similar to the one presented here. *See Koyo Seiko,* 19 CIT at ———, 905 F.Supp. at 1119–20. In *Koyo Seiko,* this Court found that Commerce properly resorted to BIA when Koyo failed to respond accurately to a deficiency letter by not reporting discounts on a transaction-specific basis. In that case, Koyo reported the discounts on a customer-specific basis stating that it would have been too burdensome to conduct a manual review of transaction-specific data in the short time frame permitted. The Court found this reasoning unpersuasive considering that Commerce had announced its intentions to require transaction-specific reporting of discounts in 1992 in the final results of an antifriction

bearings administrative review involving Koyo. *Id.* (citing *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360, 28,400 (1992)). While the antifriction bearings reviews occurred after Koyo's submission in May, 1991, Commerce had · been accepting customer-specific reporting before 1991. The new methodology announced in 1992 concerned Commerce's intention to accept only transaction-specific reporting. Customer-specific reporting was not a new methodology in 1991 when Koyo submitted its revised data. In fact, Commerce had been consistently accepting customer-specific reporting in the antifriction bearings reviews in which Koyo was a respondent before 1991. *See Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,055–56 (1989); *Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan,* 54 Fed.Reg. 19,101, 19,106 (1989). Thus, Koyo's claim in the present case that it had no knowledge of Commerce's new reporting requirements until 1993 when it received the supplemental questionnaire seems insincere at best.

In addition, Koyo actually had the choice to report the discounts on a transaction- or customer-specific basis. Koyo chose to rely on a third methodology and, therefore, did not respond completely and accurately to Commerce's request for information. As such, Commerce was justified in applying BIA to Koyo's discount sales.

■ The Court also sustains Commerce's choice of BIA. As the Court noted earlier, Commerce is granted considerable deference in its selection of BIA. *See supra* at 1045. In *Koyo Seiko,* Commerce used as BIA the highest customer-specific rate reported by Koyo for any customer receiving discounts. The Court found this choice of BIA to be consistent with law since it was based on information in Koyo's most recent responses. Similarly, in the case at bar, Commerce applied as BIA the highest percentage discount reported for any U.S. sale to all sales that received a discount during each period of review. Commerce used Koyo's own reported information for the periods of review covered in these administrative reviews. While it is true that this case involved excessive delays that were not present in *Koyo Seiko,* Commerce was also more flexible in its reporting requirements since it gave Koyo the choice to report the information on a transaction- or customer-specific basis. Koyo's decision to report its discounts based upon a completely different methodology supported Commerce's use of an adverse BIA.

### 3. *Set–Splitting Methodology*

In these administrative reviews, Commerce split TRB sets in the home market into sales of individual cups and cones for the purpose of establishing foreign market value ("FMV"). 59 Fed.Reg. at 56,040. Conceding that the Court of Appeals has affirmed a decision of this Court upholding Commerce's set-splitting methodology, Koyo asserts that the facts of this case are distinguishable because in these administrative reviews Commerce used annual averages to compute FMV as opposed to monthly averages. According to Koyo, there were sufficient sales of particular cups and cones spread over each period of review to provide Commerce with a basis for FMV without splitting sets. Koyo also contends that the underlying rationales for permitting Commerce to split sets are not applicable to the facts of this case. Pls.' Mem.Supp.Mot.J.Agency R. at 24–28.

Commerce responds that the facts of this case do not significantly differ from those cases in which the Court upheld Commerce's methodology. Defs.' Opp'n to Pls.' Mot.J.Agency R. at 20–21 (citing *NTN Bearing Corp. of Am. v. United States,* 17 CIT 1149, 1152, 835 F.Supp. 646, 649 (1993), *remanded on other grounds,* 18 CIT 104, 843 F.Supp. 737 (1994), *aff'd without opinion,* 41 F.3d 1519 (Fed.Cir.1994)). Commerce states that in *NTN,* Commerce calculated FMV for each Koyo TRB model by using the weighted-average price over the entire period of review (March 27, 1987 through September 30, 1988). Commerce further argues that

accepting Koyo's approach would allow importers to tailor their invoicing methods to circumvent the antidumping laws. Defs.' Opp'n to Pls.' Mot.J.Agency R. at 20–22.

In rebuttal, Koyo points out that in *NTN*, Commerce used annual averages with respect to Koyo and not NTN. Therefore, Koyo argues, this Court did not address in *NTN* the specific issue raised in this case. Pls.' Reply to Opp'n to Pls.' Mot.J.Agency R. at 9–10.

After citing the opinions of the Court pertaining to set-splitting and the underlying rationales for using this methodology, Commerce stated the following with respect to its decision to split sets in these reviews:

> The Department considers set-splitting to be necessary for these reviews; cups and cones split from sets are potentially the most similar merchandise to the products sold in the United States. Because they may be the most similar products, it is appropriate to include this merchandise in the pool of home-market sales.

59 Fed.Reg. at 56,040.

■ Commerce's practice of splitting sets to calculate FMV has been consistently upheld by this Court. *See NTN Bearing Corp. of Am. v. United States*, 20 CIT ——, ——, 924 F.Supp. 200, 205–06 (1996), *appeal docketed*, No. 96–1436 (Fed.Cir. July 2, 1996); *NTN Bearing Corp. of Am. v. United States*, 18 CIT 1178, ——, 881 F.Supp. 584, 590 (1994); *NTN Bearing*, 17 CIT at 1152, 835 F.Supp. at 649. In none of these cases did the Court limit the application of the set-splitting methodology to those situations in which Commerce relies on monthly averages to compute FMV. In finding Commerce's methodology to be consistent with law, the Court has noted that the practice of splitting sets discourages circumvention of the antidumping statute. In the absence of set-splitting, a respondent may compel the use of constructed value by selling sets in one market and single cups and cones in another. The use of annual averages does not alleviate this concern. Koyo's contention that there is no evidence of an attempt by Koyo to circumvent the law in this case is irrelevant. In the cases upholding Commerce's methodology, this Court has never based its decision on

facts supporting a finding that the respondents involved in the administrative reviews were actually attempting to avoid the application of the antidumping statute. In *NTN*, 18 CIT at ——, 881 F.Supp. at 590, the Court was concerned that NTN "*could have* compelled the use of constructed value." (Emphasis added). There was no evidence that NTN had actually attempted to manipulate the results of the antidumping duty reviews. Thus, Commerce did not need to demonstrate that Koyo intended to force Commerce to use constructed value before resorting to the set-splitting methodology.

Furthermore, Commerce explained in the Final Results that set-splitting was appropriate because this method would produce the most similar comparison of merchandise. This goal is reasonable and consistent with the statute. Accordingly, the Court sustains Commerce on this issue.

### Conclusion

In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this action, finds that Commerce's actions were in accordance with law and supported by substantial evidence. For the reasons stated above, the Final Results are affirmed and plaintiffs' motion is denied in all respects. This case is dismissed.

### JUDGMENT

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that plaintiffs' motion for judgment on the agency record is denied in all respects and that the determination of the Department of Commerce, International Trade Administration, is affirmed in all respects; and it is further

**ORDERED** that this case is hereby dismissed.

INTERCARGO INSURANCE
COMPANY, Plaintiff,

v.

The UNITED STATES of
America, Defendant.

Slip Op. 96–129.
Court No. 94–05–00269.

United States Court of
International Trade

Aug. 12, 1996.

Hodes & Pilon (Wayne Jarvis, Michael G. Hodes, and James L. Sawyer), Chicago, IL, for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Rhonda K. Schnare), for defendant.

## MEMORANDUM OPINION
## AND ORDER

DiCARLO, Chief Judge:

Intercargo Insurance Company, a corporate surety, provides customs bonds in the customs territory of the United States. Intercargo filed a complaint alleging, *inter alia,* the United States Customs Service regulation regarding delinquent sureties, 19 C.F.R. § 113.38 (1994), violates due process and is subject to the statute of limitations.

Defendants moved to dismiss claiming a lack of jurisdiction based on standing, ripeness, and finality of agency action. Intercargo argued that the notices Customs sent to Intercargo pursuant to 19 C.F.R. § 113.38 constituted an imminent threat of sanctions through nonacceptance of Intercargo's bonds at the district, regional, and national levels, and would entitle it to pre-enforcement review. Upon consideration of these motions,

this court granted defendant's motion to dismiss. *Intercargo Ins. Co. v. United States*, 912 F.Supp. 544 (Ct.Int'l Trade 1995).

## DISCUSSION

By the present motion, Intercargo seeks a rehearing of the court's decision pursuant to Rule 59 of this court. Intercargo claims: (1) that the court's refusal to permit discovery or conduct an evidentiary hearing constituted a significant flaw in the proceedings, and (2) that the court's denial of Intercargo's partial summary judgment motion was improper.

Rule 59(a) of this court permits a rehearing for any of the reasons for which rehearings are granted in suits in equity in United States courts, USCIT R. 59(a), and the court may use its sound discretion in deciding whether to grant or deny a motion for a rehearing, USCIT R. 59(a); *Xerox Corp. v. United States*, Slip.Op. 96–107 at 2, 1996 WL 392228 (Ct.Int'l Trade July 9, 1996).

■ The purpose of a rehearing is not to relitigate a case. *BMT Commodity Corp. v. United States*, 674 F.Supp. 868, 869 (Ct. Int'l Trade 1987), *aff'd per curiam*, 852 F.2d 1285 (Fed.Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Rather, a court will grant a rehearing only under certain limited circumstances. These circumstances include where the original proceeding suffered from: (1) an error or irregularity; (2) a serious evidentiary flaw; (3) the absence of new evidence which even a diligent party could not have discovered in time; or (4) an accident, unpredictable surprise or unavoidable mistake which impaired a party's ability to adequately present its case. *Xerox*, Slip Op. 96–107 at 2–3, 1996 WL 392228 (*citing Kerr–McGee Chem. Corp. v. United States*, 14 Ct. Int'l Trade 582, 583, 1990 WL 127166 (1990)). Further, the court will not disturb its previous decision unless it is manifestly erroneous. *United States v. Gold Mountain Coffee, Ltd.*, 601 F.Supp. 212, 214 (Ct.Int'l Trade 1984) (citing *Quigley & Manard, Inc. v. United States*, 496 F.2d 1214 (C.C.P.A.1974)). With these standards in mind, the court turns to Intercargo's arguments.

### A. Intercargo's Discovery Requests

Intercargo argues that the court's refusal to permit discovery or conduct an evidentiary hearing constituted a significant flaw in the proceedings. According to Intercargo, the court's Scheduling Order stayed discovery pending a ruling on initial dispositive motions, and therefore, forced Intercargo to oppose the Government's Motion to Dismiss based solely upon the notices issued by Customs under subsection 113.38(c)(4). By placing a heavy burden on the surety to demonstrate that its losses were sufficient for pre-enforcement review, Intercargo argues this court treated the government's Motion to Dismiss as a motion for summary judgment. Intercargo contends that discovery is necessary to expose fully the imminence of the injury it faces from Customs. Intercargo notes that Customs has continued to send it notices threatening sanction pursuant to 19 C.F.R. § 113.38(c)(4).

Intercargo alleged two types of injury. First, that Customs' notices threatening sanctions issued pursuant to 19 C.F.R. § 113.38(c)(4) (1994) were "concrete and particularized" and demonstrated that Intercargo was "one day away" from being sanctioned. *Intercargo*, 912 F.Supp. at 546. Such sanctions, according to Intercargo, would be disastrous for the company. (Compl. ¶ 30.) Second, Intercargo contended that responding to the (c)(4) notices consumed significant resources and had placed a substantial burden on the surety. *Id.*

■ The court accepted Intercargo's general factual allegations as true, but found that Intercargo purported no allegations outside the issuance of subsection 113.38(c)(4) notices to demonstrate the imminence of Customs' sanctions. *Intercargo*, 912 F.Supp. at 546. The court therefore granted defendant's Motion to Dismiss. *Cf. Schering Corp. v. United States*, 626 F.2d 162, 167 (C.C.P.A. 1980) (finding no error in Customs Court's ruling denying rehearing absent facts in either importer's response to cross motion to dismiss or its motion for rehearing which would establish jurisdiction). The court did not, *sua sponte*, transform the government's motion into a motion for summary judgment,

as Intercargo could not demonstrate its entitlement to pre-enforcement review.

Subsection (c)(4) letters merely present *notice* that Customs officials could refuse to accept the bonds of a delinquent surety at the district, regional, or national level, 19 C.F.R. § 113.38(c)(4), and, further, "provide an opportunity for resolution of outstanding debts." 19 C.F.R. § 113.38(c)(5); *Intercargo,* 912 F.Supp. at 546. Nonetheless, the sanctions threatened in the notices are within Customs' discretion and take effect *only* after review, final decision, and written notice by the appropriate Customs official pursuant to subsection 113.38(c)(5). *Intercargo,* 912 F.Supp. at 546–48.

By the terms of the regulation, Customs cannot sanction Intercargo without following certain prescribed procedures. Customs has yet to take such steps. Thus, even if the court accepts Intercargo's allegations that it has received subsection 113.38(c)(4) notices, feels threatened by the potential sanctions, and is heavily burdened in responding to the notices, Customs has not committed any act demonstrating that sanctions are imminent. Until Customs issues Intercargo a notice pursuant to subsection 113.38(c)(5) (establishing effective date for sanctions), the court cannot speculate that Customs will ever sanction Intercargo. For this reason, the additional (c)(4) letters that Customs has sent Intercargo do not alter the reality that Customs has not made a decision to sanction Intercargo, and has not commenced the procedures mandated by the regulations necessary to do so.

Discovery, therefore, would not aid Intercargo in its attempt to demonstrate its entitlement to pre-enforcement review, because

Customs is still bound to abide by its regulations. The indisputable fact remains that Customs' intent is of little significance if Customs has not issued notice pursuant to subsection 113.38(c)(5) that it will impose sanctions. Even if certain evidence exists that would clarify Customs' intent, Customs must still follow the procedures established by the regulations, and given its discretion, Customs is free to change its position at any time. After discovery, Intercargo would not be any closer to meeting the requirements for pre-enforcement review. Although Intercargo alleges the court has made improper findings of fact in granting defendant's Motion to Dismiss, Intercargo, in actuality, is demanding that the court accept its conclusions of law as general factual allegations. The court's findings that Customs' (c)(4) letters do not constitute an imminent threat were conclusions of law based on the court's reading of the plain language of the regulation.

Finally, although Intercargo has expended time and costs in responding to these letters and was concerned about the effect of sanctions on its reputation, this court's previous opinion has noted that such transactions and Intercargo's concerns are not "outside of Intercargo's ordinary responsibilities as a surety," because resolution of such debts at the administrative level would further the goals of judicial efficiency and serves the administrative process. *Intercargo,* 912 F.Supp. at 546; *cf. Gardner v. Toilet Goods Ass'n, Inc.,* 387 U.S. 167, 172–73, 87 S.Ct. 1526, 1529–30, 18 L.Ed.2d 704 (finding $49,000,000 cost for compliance as substantial hardship). Although the court assumed Intercargo's general allegations of fact in its Complaint were true,[1] the court found these allegations did

---

Customs' actually refused Intercargo's bonds, Intercargo would still be able to contest Customs'

